IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSCAR M. SANCHEZ, | Case No. 08-cv-1627-JLT |
| Plaintiff, | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

## BACKGROUND

Plaintiff Oscar Sanchez ("Claimant" or "Plaintiff") seeks judicial review of an administrative decision denying his claim for disability insurance benefits under Title II and supplemental security income benefits under Title XVI of the Social Security Act (the "Act"). Pending before the Court is Plaintiff's appeal from the administrative decision of the Commissioner of Social Security ("Commissioner"). On October 22, 2008, Plaintiff's complaint was filed in the United States District Court for the Eastern District of California. (Doc. 2). Plaintiff filed his opening brief on July 7, 2009. (Doc. 17). The Commissioner filed his opposition brief on August 6, 2009. (Doc. 18).

1

# **FACTS AND PRIOR PROCEEDINGS**[1]

On May 3, 2005, Plaintiff filed an application for disability insurance benefits under Title II and supplemental security income benefits under Title XVI of the Act. AR at 80, 229. Plaintiff alleged that he had been under a disability since January 1, 2005. Id. at 56, 707. After initial denial of his request for benefits by the Agency, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 11. On March 14, 2007, the ALJ held a hearing, and on June 19, 2007, denied benefits. Id. at 12-22. Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Id. at 22. The Appeals Council denied review on September 9, 2008. Id. at 5-7.

Hearing Testimony

The hearing was held on March 14, 2007. AR at 236. Plaintiff testified he was born on July 25, 1978. AR at 239. He stated he had no driver's license because, due to an inability to read or spell, he couldn't pass the test, although he tried to do so many times. Id. at 41. He reported that he could not pass the oral test either. Id.

Plaintiff stated he completed the eleventh grade but had problems reading and spelling. AR at 41. He stated he tried to go back to school to learn to read and write but he just couldn't do it. Id. He said that he couldn't really read, although a doctor told him he read at a second grade level. Id. at 263. His reported that his inability to read and write had prevented him from obtaining a GED. Id. at 242. He stated he was frustrated by his inability to read and spell because it prevented him from being able to fill out job applications. Id. at 263. He said that he couldn't add or subtract and this prevented him from making change when purchasing things without help. Id. at 261.

Plaintiff worked in numerous jobs. He last worked in October 2006, at New Age Metal, where he polished aluminum bike parts. AR at 243. He reported that he stopped working there after he was injured when his shirt got caught in a machine. Id. After that, he reported that he was scared to continue in that job. Id. at 245. He stated that he obtained this job with the help of his brother who also worked at New Age Metal who also supervised and trained him. Id. Plaintiff reported that if his brother had not been there to help him he did not think he could have performed the job. Id. at

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

246.

Before working at New Age Metal, Plaintiff worked at Aqua Clor. AR at 246. His testified that his job at Aqua Clor was to help manufacture and bottle bleach ammonia. Id. at 247. Despite that he wore a mask while performing this job, Plaintiff testified that the ammonia fumes aggravated his lungs and caused him to choke and gag. Id. He said that this caused him to get headaches from doing this work. Id. Plaintiff reported that his brother had worked with him at this job also and again supervised and managed his work. Id. at 248. Plaintiff reported that he left this job because of "too much hassle" with his boss. Id.

Plaintiff testified that he worked in several temporary jobs, including "washing" Christmas trees. AR at 249. He stated that he hurt his back from having to lift the trees. Id. Plaintiff reported that he worked at Foster Farms also, where he was required to lift boxes and crates that weighed as much as 50 pounds. Id. He reported that this caused his back to hurt. Id. Plaintiff stated that he obtained this job with his sister's help and that he had obtained all of his previous employment due to help from family or friends. Id. at 242. He reported that he had not had any formal job training. Id.

Plaintiff testified that he worked at Zacky Farms where he cleaned, cut up and loaded chickens onto pallets. AR at 250. He said that he hurt his back while doing this work and had to quit. Id. Before that job, he stated that he worked for a building services company, cleaning new homes. Id. He said that this job also caused him back problems and he was forced to stop working after a few months. Id.

Before his job as a cleaner, Plaintiff said that he cleaned and polished parts at Indian Motorcycle. AR at 251. He said that his brother helped him obtain this job and worked with him also. Id. While doing this work, Plaintiff reported that he got sucked into a polishing machine and broke his arm. Id. Before this job, Plaintiff testified that he did temporary work and also performed landscaping work at Mountain View Cemetery Improvement. Id. at 252. Plaintiff said that his uncle helped him get these jobs and supervised him. Id. at 253.

Plaintiff stated that his inability to read and write have hindered his job prospects. AR at 253. He stated that he had trouble learning and had to ask for assistance repeatedly because he forgot

what he had been taught. Id. at 254. In addition, he stated that he had trouble concentrating for long periods of time. Id. at 262.

Plaintiff testified that he had back problems since he was young. AR at 255. When he was 16, Plaintiff reported that he was hit by a car while crossing a street.[2] Id. at 255. After this mishap, Plaintiff reported that he began suffering bad headaches. Id. at 255. He reported that he had sought treatment for these headaches occasionally in the emergency room. Id. Plaintiff reported that he had been treated with over-the-counter medication including Ibuprofen. Id. at 256. Plaintiff reported that these headaches usually affected him in the morning and at night. Id. at 254.

Plaintiff testified that he lived in an apartment alone. AR at 258. He stated that his brother, a sister and his mother lived nearby, and that they helped him with his daily living. He reported that his mother helped him pay his bills and helped him make out shopping lists to buy groceries. Id. at 258-59. He reported that he was unable to perform tasks like obtaining money at the bank without help from others. Id. at 259. He stated that he rode the bus but could not navigate and had to rely on the driver to tell him when he needed to exit. Id. at 260. He reported that he was able to cook meals and clean his apartment. Id.

Plaintiff's older sister, Rachel Cervantes testified at the hearing. She stated that Plaintiff had an undiagnosed learning disability and was reliant on his family to help him. AR at 265. Cervantes testified that their brother usually got him to work and tried to help him on the job. Id. She said that Plaintiff could not work on his own without assistance. Id. at 266. She testified that their brother had been able to obtain work for Plaintiff by assuring employers that he would look out for Plaintiff and take care of him. Id. Cervantes testified that Plaintiff had a "strong" temper that made it difficult for him to take direction from people who were not in his family. AR at 267. She reported that Plaintiff resented being told by others what to do and thought that he was being put down because he was insecure about his learning disability. Id.

Cervantes testified that Plaintiff lived almost next door to their brother. AR at 267. She stated that their mother lived only two blocks away from him and that she lived only ten minutes

---

[2] The record indicates that Plaintiff was severely injured, including a broken leg, and spent four months in the hospital. AR at 164.

away. Id. Cervantes testified that they all helped Plaintiff and took him grocery shopping. Id. She reported that she did not believe that Plaintiff could live on his own without assistance from his family. Id. at 268. She noted that he forgot to lock the doors to his apartment and had even left keys in the front door lock without realizing it. Id.

Although Cervantes reported that Plaintiff was able to ride the bus and get around, he was only able to do this if he was familiar with the territory. AR at 269. If he was not familiar, she reported that he had trouble understanding directions. Id. Cervantes believed that Plaintiff needed "special help." Id. She stated that he tried to do things for himself but he just couldn't do it without help. Id. She reported that she worried about what would happen to him when their mother was not around to help. Id.

Vocational expert ("VE") Cheryl Chandler testified that Plaintiff's past work in labor and construction clean-up and as a cemetery worker was medium and unskilled. AR at 271. She characterized his past work in a poultry plant and as a polisher was light and unskilled. Id.

The ALJ put several hypotheticals to the VE. In the first, he described a person of Plaintiff's age, educational background and work history with no exertional limitations but limited to simple one-to-two step tasks where reading and writing were not required. AR at 271-72. The VE opined that such a person could perform some of Plaintiff's past relevant work, such as meat cutting, polishing and grounds keeping work in a cemetery. Id. at 272.

In hypothetical two, the ALJ limited the person to performing only "medium" work. AR at 272. The VE opined that such a person could still perform the work described in hypothetical one. Id. The VE stated that such a person could perform other "medium" level work, such as hand packager and automobile detailer, and cited numerous such positions in the California and national economies. Id.

In hypothetical three, the ALJ limited the person to only "light" work. AR at 272-73. The VE opined that such a person could only perform Plaintiff's past work as a meat cutter. Id. at 273. The VE stated that such a person could perform other work like hand packaging, machine feeding and light laundry work, again citing numerous such positions in the state and national economy. Id.

Finally, in hypothetical four, the ALJ used the same restrictions but stated that the person "is

unable to relate appropriately to supervisors." AR at 273. The VE opined that such a person could perform none of Plaintiff's past relevant work or any other work. Id.

Relevant Medical Record

Medical records with the University Medical Center in Fresno, California, show that Plaintiff was treated between December 2004 and July 2005 for severe headaches. AR at 146-57. The treatment included over-the-counter medication such as Ibuprofen, Tylenol and Elavil. See id. at 147, 148, 151, 152.

On July 11, 2005, Plaintiff was examined by an internist, Dr. Gurmej S. Dhillon, M.D. Plaintiff complained of lower back pain and a learning disability. AR at 158. He stated he had suffered from the back pain since he was 14 and that it was aggravated by work which required him to bend over. Id. Also, he stated that he was learning disabled from an early age. Plaintiff told Dr. Dhillon that despite special schooling through the eleventh grade, he could not read or write. Id. As a result, he reported that he was unable to get a job because he was unable to sign a job application. Id.

Plaintiff told Dr. Dhillon he was unable to do personal and household chores. AR at 159. He smoked about ten cigarettes a day but denied alcohol use. Id. He admitted that he used methamphetamine but stated he went through in patient rehabilitation for 30 days in June 2005 and was being treated on an outpatient basis for the following six months. Id.

Dr. Dhillon noted that Plaintiff was well nourished, well built and well dressed. AR at 160. Plaintiff had normal blood pressure, normal motor strength, normal hand grip and also had a normal gait. Id. Plaintiff's range of motion for his spine, upper extremities, lower extremities and wrist and hands was normal. Id. at 161-62.

Dr. Dhillon noted that Plaintiff walked well, had no joint inflammation, including in his lumbar spine, and seemed alert and well oriented. AR at 162. He was able to state his birth date, including month and year and knew the current date also. Id. When asked who was the president, Plaintiff made reference to Martin Luther King. Id.

Dr. Dhillon stated he could not tell whether any deficiencies relating to Plaintiff's mental status examination were subjective or real. AR at 162. He diagnosed chronic low back pain and

learning disability. Id. He noted, however, that Plaintiff's physical complaints were "not consistent with the physical examination so I cannot put him on any physical activity limitation on the basis of today's examination." Id. at 163. He believed a psychiatric examination would be helpful. Id.

Two days later, on July 13, 2005, Plaintiff underwent a psychological examination by Dr. Robert Engeln, Ph.D for the Department of Social Services ("DSS"). Dr. Engeln noted that Plaintiff's DSS packet described Plaintiff's potential disabling conditions as a slow learner, bad back, and learning disability causing problems on jobs including, in particular, employer frustration. AR at 164.

Dr. Engeln noted that Plaintiff was living with his sister, Rachel, at that time. AR at 165. He had no prior criminal history but admitted to past methamphetamine use. Id. He was hit by a car in 1996 while "jaywalking" and sustained serious injuries and was hospitalized for four months. Id. at 164. Plaintiff told Dr. Engeln that he lost his job at Indian Motorcycle after only three months because he failed a drug test. Id. He also stated he lost his job at "New Agent Chrome" because of anger control issues, telling Dr. Engeln "I got mad too easy, raised my voice." Id. Plaintiff stated he had no mental health problems and stated that doctors had not evaluated his headaches. AR at 165. He said that he had never had mental health treatment. Id.

Dr. Engeln described Plaintiff as alert and oriented. AR at 165. Plaintiff had no delusions, hallucinations or confusion. Id. His verbal expression was easily understood, with a quick and impulsive response style. Id. at 165-66. Dr. Engeln gave Plaintiff several tests, including the Wechsler Adult Intelligence Scale III, Wechsler Memory Scale III, Bender-Gestalt Test, Trails A and B, and the Rey 15 Item Memory Test II. AR at 164. Dr. Engeln found that Plaintiff's verbal intelligence and visual intelligence indicated a mild range of mental retardation. Id. at 166. Dr. Engeln noted that Plaintiff had a verbal IQ of 62, a performance IQ of 60 and a full scale IQ of 58, which indicated a moderate range of mental retardation. Id.

Dr. Engeln stated that "in contrast" his interview presentation suggested "mid borderline intellectual skills" and noted that the Bender-Gestalt reproductions showed "high borderline to low average range in terms of performance quality." AR at 166. He evaluated Plaintiff's academic skills by the "Wide Range Achievement Test R" and found the following grade level equivalents: reading

level in the beginning of the second grade; writing in the mid-first grade, and arithmetic at the end of the third grade. Id. The Trails A test "requiring connection of numbers in sequence 1 to 25, was characterized by multiple visual concentration errors" and the "Trails B was rejected by the patient as too difficult." Id.

Dr. Engeln described Plaintiff's working memory, reflecting processing skills, as indicative of a "moderate range of mental retardation." AR at 166. Dr. Engeln noted that Plaintiff's immediate auditory memory, auditory recognition and visual memory were delayed which indicated a "moderate range of mental retardation." Id. Conversely, Plaintiff's delayed auditory memory and immediate visual memory revealed functioning in the low average range. Id.

Dr. Engeln concluded that Plaintiff displayed no evidence of any mental or emotional illness. AR at 167. He noted Plaintiff displayed a "robust" appearance and his "[v]erbal expression was easily understood, appropriate in form and association." Id. Dr. Engeln opined that although measurements indicating Plaintiff's verbal and visual intelligence displayed a mild range of mental retardation, these were underestimates of his abilities and reflected "attitudinal-emotional issues." Id. He noted further that the response to the Rey 15 Item Memory test was "positive for exaggeration" and concluded that because of this exaggeration, he was "unable to say what his abilities actually are." Id.

Dr. Engeln opined that Plaintiff seemed mentally competent to manage his own funds but believed that in light of his substance abuse history appointment of a limited conservator to assist in money management issues was appropriate. AR at 167. Further, Dr. Engeln opined that Plaintiff was "[v]erbally, cognitively, and socially . . . capable of job adjustment in a context where instructions are unidimensional, at an entry level position where instructions are simple and unidimensional, and normal supervision is provided. Concentration and social skills are adequate for work adjustment." Id. Plaintiff could further "receive instructions that are one-to-two step in nature, but not technical or complex instructions." Id. at 167-68. Dr. Engeln found that Plaintiff's methamphetamine abuse "has been the most intrusive dimension of his life adjustment pattern." Id. at 168.

Opinions from non-examining doctors in August 2005 and January 2006, for the Social

Security Administration indicated agreement with Dr. Engeln's conclusions, in particular, that Plaintiff's mental retardation was not a "severe" impairment. AR at 177, 180. With respect to Plaintiff's mental condition, the reports noted a lack of objective support and noted an "exaggerated protocol," citing the Rey 15 Item Memory test. See id.

ALJ's Findings

The ALJ first determined that Plaintiff met his insured status through December 31, 2007. AR at 17. The ALJ then evaluated Plaintiff pursuant to the customary 5-step sequential evaluation. After determining that Plaintiff had not engaged in substantial gainful activity since January 1, 2005 (Step 1), Plaintiff's alleged date of onset of disability, the ALJ found (Step 2) that Plaintiff had the following impairments: lumbar disc disease, borderline intellectual functioning, a learning disorder, and a history of substance abuse in remission.[3] Id. However, these impairments did not meet or exceed the level required under Agency guidelines for presumed disability (Step 3). Id. at 19.

In the fourth step of her analysis, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a range of medium work, involving simple and repetitive one to two-step tasks where reading and writing are not required. AR at 19. Based on this RFC finding, the ALJ concluded that Plaintiff could not perform his past relevant work (Step 4). Id. at 21. However, at Step 5, the ALJ concluded that Plaintiff retained the RFC to perform other jobs in that national economy. Id. As a result, Plaintiff was not disabled within the meaning of the Act.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might

---

[3] The ALJ does not specifically conclude, at Step 2, that these impairments are "severe." However, given that she then analyzes Steps 3 through 5, the Court concludes that this was her finding. See 20 C.F.R. s 404.1520(a)(4)(ii) (noting that if a claimant's impairments are not severe at Step 2, a finding of disabled is warranted with no further consideration); see also 20 C.F.R. s 404.1520(c).

9

accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[4] Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) had a medically determinable and severe physical and mental impairment (lumbar disc disease, borderline intellectual functioning, a learning disorder, and a history of substance abuse in remission); (3) did not have an impairment which meets or is equal to one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) could not perform any of his past work in the

---

[4] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

national economy; but (5) retained the RFC to perform a range of medium work, involving simple and repetitive one- two-step tasks where reading and writing is not required. AR at 17, 19. The ALJ then determined that Plaintiff was not under a "disability" as defined in the Act. Id. at 22.

Plaintiff challenges the ALJ's determination at Step 5 of the sequential evaluation process, where an individual's ability to perform other work is assessed based on his RFC. Plaintiff raises one claim of error. He alleges that the ALJ improperly accepted and incorporated the VE's opinion based on Hypothetical 2 that Plaintiff could perform medium level work as a hand packager or automobile detailer without asking the VE to explain inconsistencies with the functional limitations posited in that hypothetical and the requirements for work as either a hand packager or automobile detailer outlined in the Dictionary of Occupational Titles ("DOT").

**DISCUSSION**

<u>The ALJ erred by failing to obtain an explanation for the conflict between the VE's opinion and the Dictionary of Occupational Titles</u>

Plaintiff raises one issue on appeal. He contends that the ALJ erred in concluding at Step 5 that Plaintiff, given the ALJ's RFC finding, is capable of performing other work, in particular the jobs of hand packager and automobile detailer identified by the VE. Specifically, Plaintiff contends that the Dictionary of Occupational Titles ("DOT") provides that the jobs of hand packager and auto detailer require an ability to read and write. In addition, Plaintiff contends that these occupations require the ability to perform more than simple and repetitive one-to-two step tasks, something the ALJ determined in her RFC finding that he could not do. Plaintiff argues that, in light of these conflicts, the ALJ was required to elicit from the VE an explanation for this inconsistency and that her failure to do so requires remand. (See Doc. 17 at 6-10).

During the hearing, the ALJ posed several hypotheticals to the VE. In hypothetical two, the ALJ described an individual of Plaintiff's age, educational background and work history who is "limited to medium work and . . . to simple and repetitive tasks, one to two-step job instructions where reading and writing is not required." AR at 271, 272. In addition to asserting that Plaintiff

could perform past work such as meat cutter, laborer, polisher and cemetery grounds worker[5], the VE opined that Plaintiff could perform other work such as that of hand packager and auto detailer.[6] Id. The ALJ based his RFC finding on this hypothetical. Id. at 19, 20-21.

Social Security Ruling ("SSR") 00-4p states, in pertinent part:

> Occupational evidence provided by a VE or VS generally should be consistent with information supplied by the DOT. When there is an apparent unresolved conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

The "best source" for how a job is generally performed is "usually" the DOT. Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001). For the ALJ to accept vocational expert testimony that conflicts with the DOT, the record must contain "'persuasive evidence to support the deviation.'" Id. at 846. Moreover, the ALJ has an affirmative duty to ask "whether [the VE's] testimony conflicts with the *Dictionary of Occupational Titles*." Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007). Not only must the ALJ ask the VE if his or her opinion is consistent with the DOT, the ALJ must "obtain a reasonable explanation for any apparent conflict." Id. at 1152-53.

With respect to the positions of "Packaging Occupations," the DOT describes the following with respect to reading and writing requirements for these positions under "GENERAL EDUCATION DEVELOPMENT - Language":

> READING: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.
>
> WRITING: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

---

[5] Because the ALJ determined that Plaintiff could not perform any of his past relevant work (Step 4), the opinion of the VE on this point is not relevant. See AR at 21.

[6] The hearing transcripts describe the job as "auto dealer," however, this appears to be a misprint. All of the parties, and the ALJ apprehended this job as "auto detailer." AR at 21; (Doc. 17 at 6); (Doc. 18 at 4).

1 (Doc. 17, Ex. 1). The job of automobile detailer has the same requirements. (See id.) In addition, both occupations are classified at Reasoning Level 2, which requires that the job holder:

> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

(Id.)

At the hearing, after the VE gave her opinion with respect to hypothetical two (which was incorporated by the ALJ in her RFC finding), the ALJ asked the VE if her findings were "consistent" with the DOT. AR at 272. The VE responded simply "Yes, Your Honor." Id. No further questioning or explanation was sought on this point. This was inadequate. While the ALJ asked if the VE's opinion was consistent with the DOT descriptions, she did not seek any explanation despite what appear, at the very least, to be discrepancies between the restrictions in the hypothetical and the requirements for such work as described in the DOT. For instance, despite the limitation to simple one and two-step tasks, the ALJ failed to ask the VE how this was consistent with a DOT requirement that a job holder at a Reasoning Level 2 occupation have the ability "to carry out detailed *written* or oral instructions." In addition, the ALJ failed to solicit any explanation as to how Plaintiff's inability to read or write would permit him to function in positions classified by the DOT as requiring the ability to "[r]ecognize the meaning of 2,500 (two- or three-step syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers." (See Doc. 17, Ex. 1).

The VE may have been able to reconcile these apparent conflicts or discrepancies. However, she was not asked to do so. This was error. While a claimant is not per se disabled simply because he or she is illiterate, "in order for an ALJ to rely on a job description in the Dictionary of Occupational Titles that fails to comport with a claimant's noted limitations, the ALJ must definitively explain this deviation." Pinto, 249 F.3d at 847. In this case, no such explanation was attempted. The ALJ merely accepted the VE's one word response that her findings based on the ALJ's hypothetical were consistent with the DOT. At the very least, the ALJ needed to ask the VE

for further explanation in light of the apparent differences.[7] See Massachi, 486 F.3d at 1152-53 (holding that in asking the VE if the evidence he or she is providing is consistent with the DOT, the ALJ should "obtain a reasonable explanation for an apparent conflict."); see also Pinto, 249 F.3d at 846 ("Illiteracy seriously impacts an individual's ability to perform work-related functions such as understanding and following instructions, communicating in the workplace, and responding appropriately to supervision.")

For these reasons and based upon the state of the record, the Court concludes that the ALJ erred in finding that Plaintiff was not disabled. In concluding that remand is warranted, the Court is not finding that the ALJ's decision to accept the VE's testimony in formulating her RFC finding was error. The Court is not concluding that the VE could not provide a reasonable explanation as to how her testimony was consistent with the requirements of the DOT for jobs such as hand packager and auto detailer. Rather, the Court concludes that the ALJ failed to elicit a reasonable explanation from the ALJ in light of apparent discrepancies between the RFC limitations posited in Hypothetical 2 (which were later adopted as the ALJ's RFC finding) and the general requirements in the DOT for jobs such as hand packager and automobile detailer. As a result, the Court finds that remand is appropriate. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989) (the decision to remand for further proceedings or simply to award benefits is within the discretion of the court). Because the Court finds that additional proceedings may remedy the defects noted, remand is appropriate.

## CONCLUSION

Based on the foregoing, this case is HEREBY REMANDED to the Secretary pursuant to 42

---

[7] Finally, although not specifically raised by Plaintiff on appeal, somewhat related to this issue is the question of the sufficiency of the hypothetical(s) put by the ALJ to the VE. See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989) (An ALJ posing a hypothetical question to a vocational expert "'must set out all the limitations and restrictions of the particular claimant.'" Although, testing revealed Plaintiff had IQ scores indicating "mild" to "moderate" mental retardation (including a Full Scale IQ of 58), see AR at 166, no specific mention of this is included in any of the hypotheticals put to the VE. Rather, the ALJ simply asked the VE to consider a person "same age as claimant, same educational background, same work history. . . . limited to medium work and . . . limited to simple and repetitive tasks, one to two-step job instructions where reading and writing is not required." Id. at 271, 272. Since Plaintiff's educational background indicated an eleventh grade education, it is not clear that the VE, without fuller explanation, truly appreciated all Plaintiff's functional limitations in expressing her opinions. This point is all the more relevant, given that when an additional factor where the person is "unable to relate appropriately to supervisors" is incorporated into the hypothetical, the VE opined that such a person could perform no work. Id. at 273. On remand, the ALJ should consider whether revision of her hypotheticals to the VE would be appropriate.

U.S.C. § 405(g) for further proceedings consistent with this decision.  The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

Dated: **March 11, 2010**　　　　　　　　　　　　　　　**/s/ Jennifer L. Thurston**
　　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE